# Nos. 15-2665,

15-3504, 15-3553, and 15-4189

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

Jonathan Ross, David Levin, Plaintiffs-Appellants,
Andrew Yale, on behalf of himself and all others similarly situated,
Plaintiff,
v.
AXA Equitable Life Insurance Company, Defendant-Appellee.

(*For Continuation of Caption See Inside Cover*)

---

On Appeal from the United States District Court
for the Southern District of New York

---

BRIEF FOR APPELLANTS

---

**PERKINS COIE LLP**
Timothy W. Burns
1 E. Main Street
Suite 201
Madison, WI
53703
Tel: 608.663.7460

**KESSLER TOPAZ MELTZER
& CHECK LLP**
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA 19087
Tel: 610.667.7706

(*Additional Counsel Listed on Inside Cover*)

Maria Del Carmen Robainas, Giovanni Valladares, Jose A. Capablanca, Modesto Martin, Jacqueline J. Russ, Allen Perez, Gregory Truitt, Eduardo J. Prieto, James T. Favre, International Association of Machinists and Aerospace Workers, District Lodge 15, Plaintiffs-Appellants, Andrew Yale, on behalf of himself and all others similarly situated, Plaintiff,

v.

Metropolitan Life Insurance Company, Defendant-Appellee, Metlife, Inc., Defendant.

Calvin W. Yarbrough, on behalf of himself and all others similarly situated, Plaintiff-Appellant,

v.

AXA Equitable Life Insurance Company, Defendant-Appellee.

Mark Andrew Intoccia, Sr., on behalf of himself and all others similarly situated, Ronald F. Weilert, individually and on behalf of all others similarly situated, Ann M. Weilert, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

Metropolitan Life Insurance Company, Defendant-Appellee.

**PERKINS COIE LLP**
David J. Harth
Jeff J. Bowen
Freya K. Bowen
1 E. Main Street, Suite 201
Madison, WI 53703
Tel: 608.663.7460

**PERKINS COIE LLP**
Eric D. Miller
1201 Third Ave., Suite 4900
Seattle, WA 98101
Tel: 206.359.3773

ATTORNEYS FOR APPELLANTS

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................ iii

Introduction ..................................................................................... 1

Statement of Jurisdiction ............................................................... 3

Statement of the Issue Presented for Review ............................. 4

Statement of the Case ..................................................................... 5

    I.     Statutory background ........................................................... 6

          A.     New York requires insurance companies to maintain adequate financial reserves........................... 6

          B.     Disclosure requirements help to enforce the reserve requirements ...................................................... 6

          C.     New York provides a right of action for policyholders of insurance companies that make inaccurate disclosures ........................................ 9

    II.    The NYDFS reveals AXA and MLIC's inaccurate disclosures ............................................................................. 12

    III.   Proceedings below ................................................................ 17

          A.     Ross........................................................................... 17

          B.     Robainas ................................................................... 19

          C.     Yarbrough................................................................. 19

          D.     Intoccia .................................................................... 21

Summary of Argument.................................................................... 21

Standard of Review ......................................................................... 23

Argument .......................................................................................... 24

    I.     A plaintiff establishes Article III standing by alleging an injury in fact that is fairly traceable to the defendant's conduct and that would be redressed by a favorable decision........................................ 24

    II.    The complaints allege injury in fact..................................... 25

# TABLE OF CONTENTS
(continued)

**Page**

A.      The policyholders have suffered a concrete injury  because they face an increased risk of nonpayment............................................................. 27

B.      The policyholders have suffered a concrete injury  because they obtained policies that are less valuable than those they paid for .................. 35

C.      New York Insurance Law § 4226 confirms that the policyholders have suffered concrete injuries ............................................................ 44

III.    The complaints allege that the injuries are traceable to the defendants' conduct and would be redressed by a favorable decision ......................................... 51

Conclusion ................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amidax Trading Grp.* v. *S.W.I.F.T. SCRL,*
    671 F.3d 140 (2d Cir. 2011) ............................................................... 25

*Amnesty Int'l USA* v. *Clapper,*
    667 F.3d 163 (2d Cir. 2011) ............................................................... 30

*Anderson News, LLC* v. *Am. Media, Inc.*
    680 F.3d 162 (2d Cir. 2012) ............................................................... 43

*Barbour* v. *Haley,*
    471 F.3d 1222 (11th Cir. 2006) .......................................................... 53

*Baur* v. *Veneman,*
    352 F.3d 625 (2d Cir. 2003) ......................................................... 28, 34

*Bell Atl. Corp.* v. *Twombly,*
    550 U.S. 544 (2007) ............................................................................ 43

*Bennett* v. *Spear,*
    520 U.S. 154 (1997) ............................................................................ 52

*Bevill Co.* v. *Sprint/United Mgmt. Co.,*
    77 F. App'x 461 (10th Cir. 2003) ....................................................... 51

*Cantrell* v. *City of Long Beach,*
    241 F.3d 674 (9th Cir. 2001) .............................................................. 50

*Carter v. Boehm,*
    97 Eng. Rep. 1162 (K.B. 1766) ........................................................... 45

*Carter* v. *HealthPort Techs., LLC,*
    __ F.3d __, 2016 WL 2640989 (2d Cir. 2016) ............................... 25, 45

*Carver* v. *City of New York,*
    621 F.3d 221 (2d Cir. 2010) ............................................................... 25

# TABLE OF AUTHORITIES
(continued)

**Page**

*Clapper* v. *Amnesty Int'l USA,*
133 S. Ct. 1138 (2013) .................................................................. 29, 30

*CMFG Life Ins. Co.* v. *RBS Sec., Inc.,*
799 F.3d 729 (7th Cir. 2015) ............................................................ 36

*DaimlerChrysler Corp.* v. *Cuno,*
547 U.S. 332 (2006) ........................................................................ 25

*Donohue* v. *Apple, Inc.,*
871 F. Supp. 2d 913 (N.D. Cal. 2012) ............................................... 39

*FEC* v. *Akins,*
524 U.S. 11 (1998) ........................................................................... 47

*Friends of the Earth, Inc.* v. *Gaston Copper Recycling Corp.,*
204 F.3d 149 (4th Cir. 2000) (en banc) ............................................. 28

*Gladstone Realtors* v. *Vill. Of Bellwood,*
441 U.S. 91 (1979) ........................................................................... 18

*Heldman* v. *Sobol,*
962 F.2d 148 (2d Cir. 1992) ............................................................. 51

*Hughes* v. *Ester C Co.,*
930 F. Supp. 2d 439 (E.D.N.Y. 2013) ......................................... 54, 55

*In re Aqua Dots Prods. Liab. Litig.,*
654 F.3d 748 (7th Cir. 2011) ............................................................ 41

*In re Bayer Corp. Combination Aspirin Products Mktg. &
Sales Practices Litig.,*
701 F. Supp. 2d 356 (E.D.N.Y. 2010) ............................................... 54

*In re Empire Blue Cross & Blue Shield Customer Litig.,*
622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994), *aff'd,* 640 N.Y.S.2d
102 (N.Y. App. Div. 1996) ............................................................... 55

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re Paxton*,
440 F.3d 233 (5th Cir. 2006) ................................................. 33

*Johnson* v. *Allsteel, Inc.*,
259 F.3d 885 (7th Cir. 2001) ................................................ 28

*Katz* v. *Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) .................................................. 50

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) ......................................................... 52

*Linda R.S.* v. *Richard D.*,
410 U.S. 614 (1973) ....................................................... 46, 49

*Lujan* v. *Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................... *passim*

*M'Lanahan* v. *Universal Ins. Co.*,
1 Pet. (26 U.S.) 170 (1821) .................................................. 44

*Massachusetts* v. *EPA*,
549 U.S. 497 (2007) ............................................................ 46

*Monsanto Co.* v. *Geertson Seed Farms*,
561 U.S. 139 (2010) ............................................................ 27

*Motorola Credit Corp.* v. *Uzan*,
388 F.3d 39 (2d Cir. 2004) ..................................... 22, 31, 32

*Mountain States Legal Found.* v. *Glickman*,
92 F.3d 1228 (D.C. Cir. 1996) ............................................. 28

*N.Y. Pub. Interest Research Grp.* v. *Whitman*,
321 F.3d 316 (2d Cir. 2003) ................................................ 28

# TABLE OF AUTHORITIES
(continued)

**Page**

*Nat. Res. Def. Council, Inc.* v. *U.S. Food & Drug Admin.*,
710 F.3d 71 (2d Cir. 2013) .................................................. 36

*Pub. Interest Research Grp. of N.J., Inc.* v. *Powell Duffryn
Terminals, Inc.*,
913 F.2d 64 (3d Cir. 1990) ................................................ 55

*Public Citizen* v. *Dep't of Justice*,
491 U.S. 440 (1989) .......................................................... 47

*Puritan Ins. Co.* v. *Eagle S.S. Co. S.A.*,
779 F.2d 866 (2d Cir. 1985) .............................................. 45

*Raines* v. *Byrd*,
521 U.S. 811 (1997) .......................................................... 49

*Rothstein* v. *UBS AG*,
708 F.3d 82 (2d Cir. 2013) ...................................... 52, 53, 55

*Selevan* v. *N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) ........................................ 23, 42

*Shaw* v. *Marriott Int'l, Inc.*,
605 F.3d 1039 (D.C. Cir. 2010) ........................................ 50

*Spokeo, Inc.* v. *Robins*,
136 S. Ct. 1540 (2016) .............................................. *passim*

*United States* v. *Dinome*,
86 F.3d 277 (2d Cir. 1996) ........................................ 32, 33

*United States* v. *Rossomando*,
144 F.3d 197 (2d Cir. 1998) .............................................. 32

*Wendt* v. *24 Hour Fitness USA, Inc.*,
No. 15-10309, 2016 WL 1458989 (5th Cir. Apr. 13, 2016) ................ 51

# TABLE OF AUTHORITIES
(continued)

**Page**

## Constitution, Statutes, and Regulations

U.S. Const. Art. I, § 8, Cl. 9 .................................................................. 49

U.S. Const. Art. III .................................................................. *passim*

28 U.S.C. § 1291 .................................................................. 4

28 U.S.C. § 1332 .................................................................. 3

28 U.S.C. § 1652 .................................................................. 48

Act of Apr. 23, 1935, ch. 429, § 60(B), 1935 N.Y. Sess. Laws 979. .................................................................. 9

Act of Apr. 27, 1906, ch. 326, § 60, 1906 N.Y. Sess. Laws 763. ............... 9

Act of Apr. 27, 1906, ch. 326, § 103, 1906 N.Y. Sess. Laws 763. .................................................................. 8

Act of June 15, 1939, ch. 882, § 211, 1939 N.Y. Sess. Laws 2530 .................................................................. 9

N.Y. Ins. Law § 307 .................................................................. 8

N.Y. Ins. Law § 1301 .................................................................. 6

N.Y. Ins. Law § 1303 .................................................................. 6

N.Y. Ins. Law §1402 .................................................................. 6

N.Y. Ins. Law § 4226 .................................................................. *passim*

N.Y. Comp. Codes R. & Regs. tit. 11, § 125.5 .................................... 6

## Rules

Fed. R. App. P. 4(a)(1)(A) .................................................................. 4

# TABLE OF AUTHORITIES
(continued)

**Page**

## OTHER AUTHORITIES

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ................................................................. 46

"Asks Wide Revision in Insurance Law," *N.Y. Times*, Jan. 26, 1939 ................................................. 10

H. Gerald Chapin, "The Armstrong Amendments," *The American Lawyer*, Sept. 1906 ................................. 8

Frank J. Fabozzi, *Fixed Income Analysis for the Chartered Financial Analyst Program* 664 (2000) ............................. 37

"Insurance Department To Be Investigated," *N.Y. Times*, Dec. 1, 1905 ....................................................... 10

Jerry W. Markham, *A Financial History of the United States* (2002) ........................................................ 6

NYDFS, "Life Insurance-General-Top Ten Questions," available at http://www.dfs.ny.gov/consumer/que_top10/que_life.htm ......................................................... 37

Public Hearing, Joint Legislative Committee for Recodification of Insurance Law, Dec. 30, 1937 ................... 11

Report of the Joint Committee of the Senate and Assembly of the State of New York, Assembly Document No. 41 (Feb. 1906) .................................................... 7

Vt. Dep't. of Fin. Regulation, "A Consumer's Guide To Buying Individual Life Insurance," available at http://www.dfr.vermont.gov/insurance/insurance-consumer/consumers-guide-buying-individual-life-insurance ........................................... 37, 38, 39

## INTRODUCTION

In 2013, the New York State Department of Financial Services (NYDFS) conducted an investigation that revealed that some New York-based life insurers were creating subsidiaries to reinsure their claims, allowing the parent insurers to reduce—artificially—the amount of capital they were required to hold. The subsidiaries were allowed to issue reinsurance because they held letters of credit from banks, but those letters of credit were in turn guaranteed by the parent companies, which were thus "on the hook for paying claims if the shell company's weaker reserves are exhausted." JA156. The NYDFS concluded that these "shadow insurance" transactions—which the insurers did not adequately disclose to regulators or the public—were a kind of "financial alchemy" that created the false appearance of reducing risk. *Id.* Their effect was to make insurers' capital reserves "appear larger and rosier than they actually are," leaving policyholders at greater risk. JA157.

Nearly a century ago, the New York Legislature acted to protect policyholders from just such risks. Under New York Insurance Law § 4226, life insurance companies authorized to do business in New

York must disclose their financial condition and reserve liabilities completely and accurately. The statue provides a private right of action permitting a policyholder to sue an insurer that misrepresents its financial condition.

Invoking Section 4226, appellants brought these cases on behalf of classes of policyholders against two companies that engaged in shadow insurance practices without proper disclosure, AXA Equitable Life Insurance Company (AXA) and Metropolitan Life Insurance Company (MLIC). The district court, however, dismissed the cases for lack of subject-matter jurisdiction. The court concluded that the policyholders lacked Article III standing because they failed to allege that they had suffered a concrete injury-in-fact. In the court's view, the policyholders had suffered no injury because they "received what they bargained for—life insurance," and their allegation that the policies carried an increased risk was too speculative to confer standing. SA17.

The district court's decision was contrary to settled principles of Article III standing articulated by this Court and recently reaffirmed by the Supreme Court in *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540 (2016). The policyholders have suffered harm because they face an increased

- 2 -

risk of nonpayment and because the policies they purchased are now worth less than those they were told they were purchasing. Those harms to policyholders are precisely the kind of injuries that the New York Legislature sought to prevent when it enacted Section 4226.

The judgments of the district court should be reversed, and these cases should be remanded for further proceedings so that this litigation can move forward.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over each of these four cases under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), because in each case, the amount in controversy exceeds $5 million and the plaintiff class contains more than 100 members. JA39 ¶ 29; JA98 ¶ 21; JA408 ¶ 37; JA486 ¶ 41. More than two-thirds of the members of each proposed plaintiff class reside outside of the State of New York. JA39 ¶ 30; JA98 ¶ 22; JA409 ¶ 38; JA486 ¶ 42. Each defendant is a New York corporation with its principal place of business in New York. JA38 ¶ 27; JA98 ¶ 19; JA408 ¶ 35; JA486-87 ¶ 39.

In No. 15-2665, the district court entered a final judgment dismissing the complaint on July 24, 2015, SA24, and a notice of appeal

was filed on August 19, 2015, JA67-68. In No. 15-3504, the district court entered a final judgment dismissing the complaint on October 9, 2015, SA46-47, and a notice of appeal was filed on October 30, 2015, JA382-85. In No. 15-3553, the district court entered a final judgment dismissing the complaint on October 26, 2015, SA50-51, and a notice of appeal was filed on October 30, 2015, JA457-59. In No. 15-4189, the district court entered a final judgment dismissing the complaint on December 11, 2015, SA55-56, and a notice of appeal was filed on December 30, 2015, JA593-96.

Each notice of appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(A). The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the purchasers of life insurance and of annuities with guaranteed benefits insurance riders have Article III standing to bring an action under New York Insurance Law § 4226 based on allegations that the defendant insurers made materially misleading representations about their financial condition and reserves, making the insur-

ance and annuities less financially secure—and therefore worth less—than was represented.

## STATEMENT OF THE CASE

These four cases are class actions in the United States District Court for the Southern District of New York brought by policyholders against insurance companies that made misleading representations about their financial condition and reserves, in violation of New York Insurance Law § 4226. In No. 15-2665, Judge Jesse M. Furman dismissed the complaint, holding that the plaintiffs had not alleged an injury in fact and thus lacked Article III standing. *Ross* v. *AXA Equitable Life Ins. Co.,* 115 F. Supp. 3d 424 (S.D.N.Y. 2015); SA1. In No. 15-3504, Judge Denise Cote dismissed the complaint on the same theory. *Robainas* v. *Metro. Life Ins. Co.*, No. 14CV9926 DLC, 2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015); SA27. In No. 15-3553, Judge Richard J. Sullivan dismissed the complaint on the same theory. *Yarbrough* v. *AXA Equitable Life Ins. Co.*, No. 15-CV-2585 RJS, 2015 WL 6792225 (S.D.N.Y. Oct. 22, 2015); SA48-49. In No. 15-4189, Judge Cote dismissed the complaint on the same theory. SA52-54. The policyholders

now appeal, and this Court has ordered that the appeals be heard in tandem.

## I. Statutory background

### A. New York requires insurance companies to maintain adequate financial reserves

To be certain that insurance companies will be able to pay claims when they accrue, New York, like other States, requires companies to establish adequate capital reserves and hold strong assets in support of those reserves. *See, e.g.,* N.Y. Ins. Law §§ 1301, 1303. New York also restricts the types of investments in which insurers may invest their funds. *See*, *e.g.*, N.Y. Ins. Law §1402.

An insurer may itself buy insurance from another financial institution, a practice known as "reinsurance." An insurer that uses reinsurance may be permitted to reduce the amount of assets it would otherwise be required to hold in support of its reserves. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 125.5; JA35 ¶ 8; JA44 ¶ 56.

### B. Disclosure requirements help to enforce the reserve requirements

In the wake of scandals in the life insurance industry in the early 20th century, the New York Senate engaged in a thorough investigation of the industry. Jerry W. Markham, 2 *A Financial History of the*

*United States* 19 (2002). The investigation, known as the "Armstrong Committee," revealed that several New York life insurers had taken extraordinary measures to conceal or alter figures reported to regulators. Report of the Joint Committee of the Senate and Assembly of the State of New York, Assembly Document No. 41, at 110-11 (Feb. 1906) (Armstrong Report).

The Armstrong Committee recommended numerous changes to New York's insurance laws, including enhanced disclosure requirements for life insurers. Armstrong Report 437 ("Clear and specific provision should be made for disclosure of the transactions of the companies."). Specifically, it urged the passage of legislation that would require life insurers to disclose various aspects of their financial condition in their annual statements, including, among other items, a statement of any reserve fund or surplus fund held by the company. *Id.* at 437-439. The aim of the disclosure requirements was to prevent insurer insolvency by giving full publicity to the insurers' financial conditions. As the Armstrong Committee explained, "[t]he scheme by which the superintendent may require detailed written statements . . .

would appear well calculated to prevent the secret growth of improper practices." *Id.* at 342.

In 1906, the New York Legislature reformed New York's insurance laws by enacting the great majority of the Armstrong Committee's recommendations. *See* H. Gerald Chapin, "The Armstrong Amendments," *The American Lawyer*, Sept. 1906, at 389 (noting that the new laws constituted the "sweeping reform" necessary to address the "dramatic disclosures" made public through the Armstrong investigation). As relevant here, it imposed specific annual disclosure requirements for life insurance companies. Act of Apr. 27, 1906, ch. 326, § 103, 1906 N.Y. Sess. Laws 763, 821-823 (mandating nearly all of the annual statement disclosure requirements recommended in the Armstrong Report).

Under the current version of that law, every insurance company authorized to do business in New York must file an annual statement with the NYDFS showing its financial condition at the end of the previous year. N.Y. Ins. Law § 307(a)(1). That statement must include an accurate report of eleven designated categories of information, including the insurer's reserves. *Id.* at § 4233(b)(1)-(11); *see* § 4233(a) (requir-

- 8 -

ing life insurers to complete the annual statement form adopted by the National Association of Insurance Commissioners); NAIC Annual Statement Instructions: Life, Health, and Accident at 96 (Sept. 2014) (providing instructions for reporting an insurer's reserves).

### C. New York provides a right of action for policyholders of insurance companies that make inaccurate disclosures

At the same time that it mandated financial disclosures, the New York Legislature sought to ensure their accuracy. To that end, it enacted a statute prohibiting insurance companies and agents from making certain misleading statements about their life insurance products, and it made the violation of that provision a misdemeanor. Act of Apr. 27, 1906, ch. 326, § 60, 1906 N.Y. Sess. Laws 763, 774-75. In subsequent legislation, New York expanded that prohibition to include misleading statements of the type found in the public disclosures made in insurers' statutory annual and quarterly reports. Act of Apr. 23, 1935, ch. 429, § 60(B), 1935 N.Y. Sess. Laws 979, 979-80.

In 1939, the New York Legislature created a private right of action that gave aggrieved persons the ability to sue insurers who made misrepresentations about their financial condition and reserves. Act of

June 15, 1939, ch. 882, § 211, 1939 N.Y. Sess. Laws 2530, 2714-2715. Assemblyman R. Foster Piper, chairman of the relevant legislative committee, explained that "[t]he entire purpose of the revision of the insurance law is for the strengthening of the financial structure of the companies and the safeguarding of the interests of those who buy insurance or may be claimants against insurance companies." "Asks Wide Revision in Insurance Law," *N.Y. Times*, Jan. 26, 1939. And legislators believed that the protection of policyholders could not be left solely to regulators. Instead, calls for increased regulation of the life insurance industry were accompanied by sharp criticism of what was then the New York State Insurance Department (NYSID) for failing to safeguard policyholders' interests. For example, the Armstrong Committee revealed evidence of close relations between the insurance companies being investigated and the NYSID, including financial payments, and it extended its investigation to include the NYSID. "Insurance Department To Be Investigated," *N.Y. Times*, Dec. 1, 1905. Later, during the legislative hearings on statutory revisions in the 1930s, witnesses voiced concerns about the Insurance Superintendent, including criticizing the practice of former superintendents'

accepting employment at insurance companies. Public Hearing, Joint Legislative Committee for Recodification of Insurance Law, Dec. 30, 1937, at 241.

In short, in designing its insurance law, New York sought to protect policyholders from being harmed by life insurers who engaged in financial manipulations that made them less able to fulfill their long-term commitments. It then enacted a procedural requirement to prevent that harm from materializing: it required life insurers to disclose their financial conditions and reserves in their statutory annual reports and in one-on-one interactions with their policyholders. Finally, to make sure that life insurers complied with the procedural requirement, New York penalized non-compliance and created a private right of action allowing policyholders to recover premiums paid to insurers that failed to comply.

The prohibition on misleading statements and the corresponding private right of action are currently codified at Section 4226 of the New York Insurance Law, which provides in relevant part:

> (a) No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall: . . . make any misleading representation, or any misrepresentation of the financial condition of any such

insurer or of the legal reserve system upon which it operates; . . .

(d) Any such insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice law and rules.

N.Y. Ins. Law § 4226.

## II.   The NYDFS reveals AXA and MLIC's inaccurate disclosures

In 2013, the NYDFS issued a comprehensive report (the "NYDFS Report") revealing that 17 New York life insurers had made misleading statements of their financial condition and reserves. JA156-57; JA160; JA176-77. The report described how the insurers had been using shadow insurance practices to evade New York's reserve requirements. JA156-57.

As the NYDFS explained, an insurer using shadow insurance creates a "captive" reinsurance subsidiary, "which is essentially a shell company owned by the insurer's parent," and is often domiciled in a jurisdiction with lower reserve and capital requirements. JA156. The captive subsidiary then reinsures a block of the parent insurer's existing policy claims. *Id*. For the parent insurer to be able to use the rein-

surance transaction to reduce its required reserves, the captive usually must post collateral acceptable to the parent's more stringent regulator. JA35 ¶ 8. This often involves the captive obtaining a letter of credit—an acceptable type of collateral—from a bank. *Id*. In a shadow insurance transaction, however, the parent company or another affiliate within its holding company system guarantees the captive's obligations to the bank under the letter of credit (a "parental guarantee"). *Id*. ¶ 9. The result of the parental guarantee, according to the NYDFS, is that the transaction "does not actually transfer the risk for those [reinsured] insurance policies because . . . the parent company is ultimately still on the hook for paying claims if the shell company's weaker reserves are exhausted." JA156.

The NYDFS investigation revealed that by using shadow insurance, certain life insurance companies were making their "capital buffers—which serve as shock absorbers against unexpected losses or financial shocks—appear larger and rosier than they actually are." JA157. Ultimately, the NYDFS explained, "when the time finally comes for a policyholder to collect promised benefits after years of paying premiums . . . there is a smaller reserve buffer available . . . to

ensure that the policyholder receives the benefits to which they are legally entitled." JA156.

The NYDFS Report revealed that one insurer had used $1.9 billion in letters of credit backed by parental guarantees as collateral for reinsurance transactions with its captives, thereby permitting it to take billions of dollars in reserve credit without materially reducing its risk. JA166; JA35 ¶ 10; JA49 ¶ 77; JA54 ¶ 100-01. The report did not identify the insurer by name, but it was later discovered to be AXA. JA52 ¶ 90. AXA used these transactions to artificially increase its risk-based capital ratio, an important measure of an insurer's financial strength, by 127%. JA54 ¶ 100; *see* JA42 ¶ 48 (explaining that the risk-based capital ratio is "the prime capital adequacy measure used by regulators in the United States to identify weakly capitalized life insurers"). AXA reported its artificially inflated risk-based capital ratio and additional reserve credit in the statutory annual statements filed with New York insurance regulators without publicly disclosing any of the parental guarantees on which it was based. JA54 ¶¶ 100-01; JA59 ¶ 129.

The NYDFS Report revealed that another insurer had used $1.184 billion in letters of credit backed by contractual parental guarantees as collateral for reinsurance transactions with its captives, thereby permitting it, too, to take billions of dollars in reserve credit without materially reducing its risk. JA165; JA116-17 ¶¶ 92-93; JA129-30 ¶ 143. The report did not identify that insurer by name, but it was later discovered to be MLIC. JA95 ¶ 6. MLIC also derived reserve credit from a reinsurance agreement with a captive that was partly funded by $1.85 billion in surplus notes that were indemnified by MLIC's parent. JA165; JA130 ¶ 145. As a result of these transactions, MLIC artificially improved its risk-based capital ratio by 109%. JA131 ¶ 147. MLIC reported its artificially inflated risk-based capital ratio and additional reserve credit in the statutory annual statements filed with New York insurance regulators without adequately disclosing any of the parental guarantees on which it was based. JA129-30 ¶¶ 142-43; JA131 ¶ 147; JA132 ¶ 154.

The NYDFS also found that MLIC had engaged in two other troubling practices. JA117-18 ¶96. First, MLIC engaged in "Two-Step Transactions" by ceding risks to affiliates that then retroceded that

risk to a captive, which collateralized the retrocession with a parental guarantee. JA118 ¶ 97. According to the NYDFS, by making the purported risk transfer in two steps, those transactions "obscure[d] the risks that insurers are taking on through shadow insurance" by eliminating any direct transaction between the original New York-based insurer and the captive. JA159; JA118-199 ¶¶ 97-98. Second, one of MLIC's captives, MetLife Reinsurance Company of Vermont (MRV), counted undrawn letters of credit with parental guarantees as "admitted assets" on the captive's balance sheet. JA121 ¶ 107. The captive used those letters of credit—instead of cash or bonds—to satisfy its reserve requirement. JA159-60; JA120 ¶ 103. New York, however, does not count such "hollow assets" as admitted assets, even for company-affiliated captive reinsurers. JA120 ¶ 105. As with the parental guarantees, MLIC did not disclose in its statutory annual statement that $315 million in letters of credit backing MLIC's reinsurance transactions with MRV was reported as an admitted asset on MRV's books. JA130 ¶ 144.

The NYDFS explained that the companies' failure to adequately disclose their shadow insurance practices was significant because

shadow insurance imperils the solvency of life insurers. "[T]he potential unfunded liability that would be incurred by the parent company should a drawdown of the letter of credit occur," the NYDFS observed, "could lead to a liquidity issue within the holding company—and thus adversely impact policyholders." JA177.

## III.  Proceedings below

These appeals arise from four class-action lawsuits filed in the United States District Court for the Southern District of New York against AXA and MLIC by policyholders of those companies, alleging that the companies' use of "shadow insurance" transactions without proper disclosure violated New York Insurance Law § 4226.

### A.  *Ross*

In *Ross*, a proposed class of AXA life insurance policyholders alleged that AXA had manipulated its reserves and had artificially inflated key financial indicators by failing to disclose that it had taken reserve credits based on letters of credit guaranteed by its own holding company parent. JA47 ¶ 70; JA53-54 ¶¶ 93-101; JA58 ¶ 121; JA63 ¶ 143. According to the complaint, AXA offered life insurance with fewer reserves and less sound financial backing at a price comparable to that charged by other insurers that did not engage in such practices. JA60

¶ 132. In so doing, AXA placed products with undisclosed risks onto the market and had increased the overall risks faced by policyholders. JA47-49 ¶¶ 72, 78; JA60 ¶ 132. Ultimately, the policyholders paid premiums for life insurance policies that were less financially secure than AXA represented them to be. JA63 ¶ 145.

The district court initially permitted the claims to proceed, denying a motion to dismiss. The court held that New York's state procedural rule against class actions did not prevent the plaintiffs from bringing a class action lawsuit in federal court, and it also determined that a plaintiff need not be a resident of New York to assert a claim under Section 4226. JA27-32.

Thereafter, the district court granted a renewed motion to dismiss for lack of Article III standing. SA1. The court reasoned that while "'*Congress* may, by legislation, expand standing to the full extent permitted by Art[icle] III,'" a state legislature lacks such authority, and therefore "whether a state law authorizes standing, or whether a plaintiff has standing to bring suit in state court more generally, is irrelevant to the Article III analysis." SA14-15 (quoting *Gladstone Realtors* v. *Vill. Of Bellwood*, 441 U.S. 91, 99-100 (1979)) (brackets in

original). Observing that the policyholders "do not allege . . . that they paid higher premiums as a result of AXA's misrepresentations," the court concluded that the policyholders had failed to allege that they "themselves were injured, financially or otherwise." SA16. In the court's view, the policyholders had "received what they bargained for— life insurance," and their allegations that the policies were riskier were "far too hypothetical, speculative, and uncertain" to establish standing. SA17; SA19.

### B. *Robainas*

The *Robainas* plaintiffs sued MLIC on behalf of a proposed class of MLIC life insurance policyholders, making allegations similar to those in *Ross*. JA112-13 ¶¶ 77-78; JA129-32 ¶¶ 142-53; JA137 ¶ 170; JA148 ¶ 206. Relying in part on the *Ross* decision, the district court dismissed the complaint for lack of Article III standing. SA27; SA38-40.

### C. *Yarbrough*

The *Yarbrough* plaintiff sued AXA on behalf of purchasers of guaranteed benefit insurance riders attached to variable annuity contracts issued by AXA. JA396 ¶ 1. Unlike a fixed annuity, in which the company promises to pay the annuitant a definite amount, a variable

annuity pays benefits that depend upon how the annuitant's investments perform. JA397 ¶ 4. To reduce risk and thus attract annuity purchasers, issuers of annuities offer explicit guarantees of payout or performance for an additional premium. JA398 ¶ 8. These guaranteed benefits are available as separate insurance "riders" to a variable annuity contract, and purchasers pay higher and specifically designated premiums to obtain this insurance in the form of guaranteed benefits. *Id*. Such "guaranteed benefits insurance riders" can take several possible forms and could include, for example, a guaranteed minimum benefit to be paid upon the owner's death. JA398-99 ¶ 8. To ensure that the company is able to meet its guarantees, the issuers of annuities, like life insurers, are required to establish reserve liabilities, to hold strong assets in support of those reserves, and to file detailed financial reports. JA399 ¶¶ 10-11.

The *Yarbrough* plaintiff alleged that annuity purchasers had paid premiums for guaranteed benefits insurance riders that were less financially secure than AXA represented them to be. JA433 ¶ 135. Relying on the decisions in *Ross* and *Robainas*, the district court dismissed the complaint for lack of Article III standing. SA48-49.

**D.    *Intoccia***

The *Intoccia* plaintiffs filed suit on behalf of a proposed class of purchasers of guaranteed benefits insurance riders attached to variable annuity contracts issued by MLIC, making allegations similar to those in the other cases. JA503 ¶¶ 110-11; JA520-49 ¶¶ 174-85; JA526 ¶ 198; JA533-34 ¶ 229. Relying on the *Robainas* decision, the district court dismissed the complaint for lack of Article III standing. SA52-54.

## SUMMARY OF ARGUMENT

To establish Article III standing, a plaintiff must show that it has suffered an injury in fact that is fairly traceable to the defendant's conduct and that would be redressed by a favorable decision. The complaints in these cases adequately allege all of the elements of standing, and the district court erred in granting the motions to dismiss.

The insurance companies' inadequately disclosed shadow insurance transactions have inflicted a concrete injury on the policyholders by increasing the risk that the companies will be unable to pay the policyholders' claims. The Supreme Court and this Court have repeatedly held that a risk of harm can constitute a concrete injury. For example, this Court has held that when a debtor dilutes the collateral securing a loan, the creditor has suffered an injury in fact even if the

- 21 -

debtor has not yet defaulted on the loan. *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39 (2d Cir. 2004). The injury here is the economic equivalent of that kind of harm.

The injury to the policyholders is also the difference between the value of the insurance policies and annuities as they were represented by the companies and the value of the policies and annuities that the policyholders actually obtained. A promise of future payment—such as an insurance policy or an annuity—is necessarily worth less when it is issued by a financially weak institution than when it is issued by a strong one. Courts have held that consumers who purchased products with hidden defects have standing to sue, even if the products have not yet malfunctioned. As in those cases, the policyholders suffered an injury because the products they purchased turned out to be worth less than the products the companies represented they were selling.

To the extent there is any doubt about whether the policyholders have suffered a concrete injury, that doubt is removed by New York Insurance Law § 4226. The Supreme Court has made clear that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles."

*Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1549 (2016). Section 4226 has close common-law antecedents, and it reflects a legislative judgment that the harm of being deprived of accurate information constitutes real injury to policyholders.

Finally, the complaints adequately allege that the policyholders' injury is fairly traceable to the defendants' conduct and that it would be redressed by a favorable decision. The district court suggested that traceability was lacking because the policyholders did not allege that they relied on the companies' misrepresentations in making their purchasing decisions. But the traceability test does not include a proximate-cause requirement, and it is not a basis for imposing a reliance element that the New York Legislature has not enacted.

## STANDARD OF REVIEW

This Court reviews a district court's order dismissing a complaint for lack of standing *de novo*. *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009).

- 23 -

## ARGUMENT

### I.  A plaintiff establishes Article III standing by alleging an injury in fact that is fairly traceable to the defendant's conduct and that would be redressed by a favorable decision

To establish Article III standing, a plaintiff must show (1) that it has "suffered an injury in fact," (2) that the injury is "fairly traceable to the challenged conduct of the defendant," and (3) that the injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016); *accord Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). To be concrete, an injury need not be "tangible," but it must have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 1549. In some cases, "the violation of a procedural right granted by statute can be sufficient" to establish such an injury. *Id.* And a "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, as opposed to in "some indefinite way in common with

people generally." *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332, 344 (2006).

Each element of a plaintiff's standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the motion-to-dismiss stage, a plaintiff "has no evidentiary burden." *Carter* v. *HealthPort Techs., LLC*, __ F.3d __, 2016 WL 2640989, at *6 (2d Cir. 2016). Instead, it need only "allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Those allegations need not establish that the plaintiff will prevail on the merits: "the standing question is distinct from whether [the plaintiff] has a cause of action." *Carver* v. *City of New York*, 621 F.3d 221, 226 (2d Cir. 2010).

## II. The complaints allege injury in fact

The complaints allege that the insurance companies circumvented state-mandated reserve requirements by using shadow insurance transactions to reduce the amount of assets they were required to hold without proper disclosure, leaving the companies and their policyhold-

ers "substantially exposed to the very risk that the insurer had ostensibly transferred to the company-affiliated captive reinsurer." JA49 ¶ 78. That conduct has harmed the policyholders in two related ways: it has exposed them to an increased risk of nonpayment, and it has decreased the economic value of the policies that they purchased. It has also harmed them by depriving them of the accurate information that New York Insurance Law § 4226 guarantees.

There is no question that the policyholders' harms are "legally cognizable"—Section 4226 establishes a right of action for policyholders to recover for those harms. Nor is there any serious dispute that the harms are particularized. The harm caused by the challenged conduct is not merely harm to the public at large; it is harm to the purchasers of insurance policies and annuities from the companies. As such, it has "affect[ed] the plaintiff[s]," as purchasers of policies and annuities, "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1; *see Spokeo*, 136 S. Ct. at 1550 (Thomas, J., concurring) ("Common-law courts more readily entertained suits from private plaintiffs who alleged a violation of their own rights, in contrast to private plaintiffs who asserted claims vindicating public rights.").

The district court nevertheless believed that the policyholders had failed to establish Article III standing because, in its view, their injuries were insufficiently concrete. The court's reasoning was flawed.

### A. The policyholders have suffered a concrete injury because they face an increased risk of nonpayment

The NYDFS found that the insurance companies' shadow insurance transactions had "put[] insurance policyholders and taxpayers at greater risk." JA156. In the complaint, the policyholders specifically alleged that "AXA's failure to disclose its shadow insurance practices . . . meant that AXA could offer life insurance with fewer reserves and less sound financial backing at a comparable price to other insurers that did not engage in such practices." JA60 ¶ 132. They further alleged that AXA's shadow insurance practices "permitted AXA to place a product with undisclosed risks . . . onto the market." *Id.* That risk of nonpayment is a concrete injury that establishes the policyholders' standing.

1. The Supreme Court recently explained that "the *risk* of real harm" can "satisfy the requirement of concreteness." *Spokeo*, 136 S. Ct. at 1549 (emphasis added); *see Monsanto Co.* v. *Geertson Seed Farms*, 561 U.S. 139, 154 (2010) (farmers established standing by showing a

- 27 -

"substantial risk" of contamination of their crops). Courts have applied that principle in a variety of contexts. As this Court has observed, "the courts of appeals have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes." *Baur* v. *Veneman*, 352 F.3d 625, 633 (2d Cir. 2003); *accord Friends of the Earth, Inc.* v. *Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc) ("Threats or increased risk thus constitutes cognizable harm."). For example, this Court has held that "uncertainty about exposure" to harmful air pollution is sufficient to confer standing, *N.Y. Pub. Interest Research Grp.* v. *Whitman*, 321 F.3d 316, 326 (2d Cir. 2003), as is "an unreasonable exposure to risk" from dangerous food products, *Baur*, 352 F.3d at 634; *see also Johnson* v. *Allsteel, Inc.*, 259 F.3d 885, 890 (7th Cir. 2001) (alteration to ERISA plan "increased the likelihood that [the plaintiff] will, at some point, be denied benefits under the Plan" and thereby "decreased the certainty of his Plan entitlements, causing him immediate injury"); *Mountain States Legal Found.* v. *Glickman*, 92 F.3d 1228, 1234-35 (D.C. Cir. 1996) (increase in risk of forest fires resulting

from Forest Service action sufficient to confer standing to challenge that action).

To confer standing, a risk of harm must not be "too speculative for Article III purposes." *Clapper* v. *Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Lujan*, 504 U.S. at 565 n.2). But the Supreme Court has not "uniformly require[d] plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Id.* at 1150 n.5. Rather, it has often "found standing based on a 'substantial risk' that the harm will occur." *Id.* The allegations in these cases describe such a risk.

The district court stated that "absent any real or impending risk from [the insurance companies'] practices and nondisclosures, Plaintiffs' conclusory allegations of current risk do not suffice to confer Article III standing." SA19. In the court's view, the risk that the companies "will be unable to pay Plaintiffs' claims when they are eventually made" is "far too hypothetical, speculative, and uncertain." *Id.* That is incorrect. Unlike the risks alleged in cases in which the Supreme Court has found a lack of standing, the risk at issue here does not rest on a "speculative chain of possibilities," *Clapper*, 131 S. Ct. at 1150,

- 29 -

nor on the policyholders' "subjective fear," *id.* at 1151 (quoting *Amnesty Int'l USA* v. *Clapper*, 667 F.3d 163, 180 (2d Cir. 2011) (Raggi, J., dissenting from denial of rehearing en banc)). To the contrary, the substantial risk that shadow insurance transactions will harm both "insurance policyholders and taxpayers" has been recognized in an official statement of a government agency. JA156. As the NYDFS explained, shadow insurance practices mean "that when the time finally comes for a policyholder to collect promised benefits after years of paying premiums . . . there is a smaller reserve buffer available at the insurance company to ensure that the policyholder receives the benefits to which they are legally entitled." *Id.* The practice "is reminiscent of certain practices used in the run up to the financial crisis," and those "risky practices left . . . companies on the hook for hundreds of billions of dollars in losses from risks hidden in the shadows." *Id.*

2. The financial risk at issue here is closely analogous to harms that this Court has recognized to be sufficient to confer standing. For example, this Court has held that the dilution of collateral securing a debt of uncertain amount constitutes an injury in fact to the creditor because it increases the risk that the creditor will be unable to recover.

In *Motorola Credit Corp.* v. *Uzan*, plaintiffs Motorola and Nokia lent money to two Turkish telecommunications companies, Telsim and Rumeli Telefon, to enable those companies to purchase cellular equipment and to acquire a cellular license in Turkey. 388 F.3d 39, 43 (2d Cir. 2004). As collateral for those transactions, the Turkish companies pledged a percentage of Telsim's outstanding shares. *Id.* The Turkish companies later diluted the value of that collateral by tripling the number of Telsim shares. *Id.* This Court concluded that "defendants' dilution and eventual destruction of plaintiffs' collateral amounts to the requisite 'injury-in-fact' for Article III purposes," even though no default had yet occurred. *Id.* at 55. As the Court explained, "the *injury* to Motorola and Nokia was not contingent on any future event, even if the *damages* stemming from that injury could not be identified with precision at the pleading stage." *Id.*; *see Spokeo*, 136 S. Ct. at 1549 (noting that "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure"). That reasoning is also consistent with this Court's repeated observation, in the context of criminal fraud prosecutions, that a defendant who lies to obtain a loan has "intended to inflict a genuine harm upon the bank,"

even if he "plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank," because he has "deprive[d] the bank of the ability to determine the actual level of credit risk and to determine for itself on the basis of accurate information whether, and at what price, to extend credit." *United States* v. *Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998); *see also United States* v. *Dinome*, 86 F.3d 277, 284 (2d Cir. 1996).

Other courts of appeals have endorsed the reasoning of *Motorola Credit*. In *Constellation Energy Commission* v. *FERC*, for example, the D.C. Circuit held that Southern California Edison Company, a purchaser of energy that claimed it was owed a refund for amounts it had paid in excess of just and reasonable rates, had standing to challenge the Federal Energy Regulatory Commission's decision to allow the seller to release collateral being held to cover pending refunds. 457 F.3d 14, 20 (D.C. Cir. 2006). Though the amount of refunds had yet to be determined, and though there was no allegation that the seller was likely to become insolvent, the court agreed that the reduction in collateral constituted an injury in fact that satisfied Article III. The court explained that "the increased risk of non-recovery inherent in the

reduction of collateral securing a debt of uncertain amount is sufficient to support . . . standing." *Id.*; *accord In re Paxton*, 440 F.3d 233, 236 (5th Cir. 2006) (loss of interest in collateral "result[s] in a harm that is both concrete and actual").

The same is true here. An insurance company's obligation to hold sufficient assets to support its reserves serves the same economic function as collateral: it helps to ensure that the company will be able to pay its debts to the policyholders. The policyholders have suffered a concrete injury because the insurance companies' shadow insurance activities have diminished those reserves and the concomitant obligation to hold assets, thereby increasing the risk of non-recovery on the policyholders' life insurance policies and annuities.

3. Recognizing an increase in the risk of nonpayment as an immediate, concrete injury is particularly appropriate in the insurance context. The main purpose of an insurance transaction is to reduce the policyholder's exposure to risk, and the purpose of the New York insurance law is to guarantee that insurance companies are able to honor their risk-mitigation promises. The companies' subversion of those purposes has harmed the policyholders, whose "claim of cognizable

injury" is "reinforc[ed]" because "there is a tight connection between the type of injury which [the plaintiff] alleges and the fundamental goals of the statutes he sues under." *Baur*, 635 F.3d at 635.

That "tight connection" between the policyholders' injury and the statutory purpose makes clear that this case does not present one of the two circumstances identified in *Spokeo* in which a plaintiff may have a private right of action for a statutory violation but nevertheless may lack standing. First, as the Supreme Court explained, a plaintiff may lack standing when the legislature has imposed a procedural requirement that bears no relationship to the risk of real harm identified by the legislature. 136 S. Ct. at 1550 ("[N]ot all inaccuracies cause harm or present any material risk of harm."). Second, when a defendant has technically violated a procedural requirement but has not engaged in the harmful conduct that requirement is designed to prevent, the plaintiff may lack standing. *Id.* ("[E]ven if a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, that information regardless may be entirely accurate.").

Neither exception applies here. The procedural requirement to provide truthful financial and reserve information goes to the very heart of the risk of real harm New York sought to prevent: the risk that the life insurer will engage in financial manipulations that make it less able to make good on its long-term commitments. Second, the insurers' violation of New York's procedural requirements was not merely technical. As determined by the New York insurance regulator, the insurers played a shell game concerning their financial condition and reserve liability, making their financial condition look rosier than it actually was. Because that misconduct posed a substantial risk to the policyholders, it constituted an injury in fact that gives rise to Article III standing.

## B. The policyholders have suffered a concrete injury because they obtained policies that are less valuable than those they paid for

The insurance companies' practices also harmed the policyholders by reducing the value of the policies they purchased. As the complaints explain, the policyholders "paid premiums for life insurance policies that are less financially secure than [the companies] represented them to be . . . . [and] also paid premiums for life insurance

- 35 -

policies sold by an insurer authorized by the State of New York that nonetheless failed to comply with New York law governing representations made by such an authorized insurer." JA63 ¶ 145; *see also* JA433 ¶ 135. Those allegations, all of which must be taken as true, show that the policyholders suffered a concrete, immediate financial harm of a kind that courts have long recognized as satisfying Article III. *See, e.g.*, *Nat. Res. Def. Council, Inc.* v. *U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing.").

1. The district court believed that because "Plaintiffs received what they bargained for—life insurance," they could not have been "financially harmed by virtue of their purchases." SA17. That reasoning ignores the economic reality that the value of insurance and annuities—or any other financial product involving the promise of a payment in the future—depends in part upon the risk of nonpayment. *See*, *e.g.*, *CMFG Life Ins. Co.* v. *RBS Sec., Inc.*, 799 F.3d 729, 734 (7th Cir. 2015) (noting that "the value of securities" reflects "the risk of default"). Those effects are obvious in the case of publicly traded securities. For example, when a bond issuer's creditworthiness decreases,

- 36 -

the value of the bonds decreases. *See, e.g.*, Frank J. Fabozzi, *Fixed Income Analysis for the Chartered Financial Analyst Program* 664 (2000) ("An unanticipated downgrading of an issue or issuer increases the credit spread sought by the market, resulting in a decline in the price of the issue or the issuer's debt obligation."). And while life insurance and annuities are not ordinarily traded on a secondary market, the same economic principle applies: the value of the insurance sold by a financially weak institution is less than the value of insurance sold by a stronger insurer. *See, e.g.*, NYDFS, "Life Insurance-General-Top Ten Questions," available at http://www.dfs.ny.gov/consumer/que_top10/que_life.htm (recommending that life insurance purchasers consider the "financial safety" of a life insurance company when choosing a life insurer); Vt. Dep't of Fin. Regulation, "A Consumer's Guide To Buying Individual Life Insurance," available at http://www.dfr.vermont.gov/insurance/insurance-consumer/consumers-guide-buying-individual-life-insurance ("Since you may live for many years after purchasing a life insurance policy, one important factor to consider in choosing a company is its financial strength."). Because the defendant insurance companies had less long-term ability to repay

- 37 -

than they purported to have, everyone who purchased from them received policies that were worth less than what the companies represented.

This Court has recognized that precisely that kind of diminution in value constitutes a cognizable injury. In *NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, for example, the Court considered claims that the issuers of mortgage-backed securities had misstated the creditworthiness of the mortgage borrowers. 693 F.3d 145, 151-52 (2d Cir. 2012). The Court held that purchasers of those securities had Article III standing because they had "plausibly alleged . . . a diminution in the value" of the securities. *Id.* at 158. The Court explained that "the revelation that borrowers on loans backing the Certificates were less creditworthy than the Offering Documents represented affected the Certificates' 'value' immediately, because it increased the Certificates' credit risk profile." *Id.* at 166. Like the insurance companies here, the issuers argued that "plaintiff suffered no loss because the Complaint did not allege any missed payment," but the Court rejected that reasoning, noting that "basic securities valuation principles—discounting future cash flows to their present value

using a rate of interest reflecting the cash flows' risk—belie the proposition that a fixed income investor must miss an interest payment before his securities can be said to have declined in 'value.'" *Id.*

The holding in *NECA-IBEW Health & Welfare Fund* is consistent with the more general principle that a consumer who acquires less in a transaction than he or she would have absent the defendant's wrongful conduct has suffered an economic injury sufficient to establish standing under Article III. For example, in *Cole* v. *GMC*, the Fifth Circuit held that the consumers who had purchased cars with defective airbags had standing to sue the manufacturer even though they had not yet suffered any physical injury—and perhaps never would. 484 F.3d 717, 723 (5th Cir. 2007). As the court explained, the purchasers alleged that they "suffered economic injury at the moment [they] purchased" a car, and they sought "recovery for their actual economic harm (*e.g.*, overpayment, loss in value, or loss of usefulness) emanating from the loss of their benefit of the bargain." *Id.*; *see also Donohue* v. *Apple, Inc.*, 871 F. Supp. 2d 913, 920 (N.D. Cal. 2012) (purchasers of cellphones with defective signal meter had standing because a consumer who "unknowingly buys an iPhone with a defective signal meter acquires in

a transaction less than he or she would have absent the defect") (internal quotation marked omitted).

Here, the policyholders purchased life insurance and annuities from insurance companies that held fewer assets in support of their reserve liabilities than if the companies had not engaged in shadow insurance. *See* JA60 ¶ 132; JA63 ¶ 145. Much like a defect in a tangible product, that defect was present the moment the policyholders purchased their policies and annuities, thus lowering the value of the products and causing economic injury sufficient to satisfy Article III. And, although the policyholders have not yet suffered injury in the form of nonpayment, they have suffered economic injury from purchasing a product that is worth less because of the companies' misrepresentations and nondisclosures.

2. The policyholders' allegation that they received less valuable policies than they were promised also can be understood as an allegation that they paid more for the policies than the policies were worth. Courts have repeatedly held that the injury-in-fact requirement is satisfied by such allegations. For example, the Seventh Circuit held that purchasers of allegedly defective toys suffered a sufficient injury

to establish standing because, even though no one was physically injured by the toys, "[t]he plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the [toys] posed to children." *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750-51 (7th Cir. 2011). Similarly, in *Maya* v. *Centex Corp.*, the Ninth Circuit determined that homeowners had standing to sue a housing developer for practices that allegedly caused them to overpay for their homes. 658 F.3d 1060, 1069 (9th Cir. 2011) ("Plaintiffs claim that, as a result of defendants' actions, they paid more for their homes than the homes were worth at the time of sale . . . . We agree with plaintiffs that these are actual and concrete economic injuries.").

Here, the policyholders likewise paid for insurance policies and annuities from the companies at similar rates to those charged by other insurers, but the policies were less financially secure due to the companies' use of shadow insurance without proper disclosure. The policyholders specifically alleged that they "paid premiums for life insurance policies that are less financially secure than [the companies] represented them to be," JA63 ¶ 145, and that the companies' shadow insurance practices allowed it to "offer life insurance with fewer re-

serves and less sound financial backing at a comparable price to other insurers that did not engage in such practices." JA60 ¶ 132. Those allegations fit squarely within established case law providing that paying more for a product than is warranted constitutes injury in fact under Article III.

The district court stated that "[p]laintiffs do not allege . . . that they paid higher premiums as a result of [the companies'] misrepresentations." SA16. That observation misses the point. The policyholders did not pay higher premiums than they would have paid to other insurers for the product as it was represented to be; instead, they bought an inferior product for the same price they could have paid for a superior product. JA60 ¶ 132; JA63 ¶ 145 (alleging that [the companies'] use of shadow insurance allowed them to sell life insurance of inferior quality at the same price other insurers charged for life insurance without those defects). The policyholders thus overpaid for the product they actually purchased. To the extent there is any doubt on the point, the district court was required to "construe plaintiffs' complaint liberally, . . . drawing all reasonable inferences in plaintiffs' favor." *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)

(internal quotation marks omitted). Under that standard, the complaints adequately allege that the policyholders purchased life insurance policies and annuities that were less financially secure than they were represented to be and, by extension, paid more than was warranted.

The district court suggested that the allegation of higher premiums was made "without any plausible basis" and that "using shadow insurance actually reduces the cost of life insurance policies." SA39. Of course, using shadow insurance does *not* reduce the risk-adjusted price, which is the price that is relevant to policyholders. In any event, the plausibility standard is not an invitation to the district court to weigh the evidence and reach its own factual conclusions. A court ruling on a motion to dismiss must proceed "on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). It "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." *Anderson News, LLC* v. *Am. Media, Inc.* 680 F.3d 162, 185 (2d Cir. 2012). The court's speculation was

not an appropriate basis for disregarding the complaint's allegations of injury.

### C. New York Insurance Law § 4226 confirms that the policyholders have suffered concrete injuries

The Supreme Court has held that "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549. To the extent there is any doubt whether the policyholders' injuries are sufficiently concrete to establish Article III standing, those considerations establish that they are.

1. The harms sought to be remedied by the actions in this case bear a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. At common law, it was well settled that the parties to an insurance contract had "a right to a disclosure of all material facts." *M'Lanahan* v. *Universal Ins. Co.*, 1 Pet. (26 U.S.) 170 (1821). As Lord Mansfield explained, the question "must always be whether there was, under all the circumstances at the time the policy was under-written, a fair representation; or a concealment . . . varying materially the object of the policy, and changing the risque understood

to be run." *Carter* v. *Boehm*, 97 Eng. Rep. 1162, 1165 (K.B. 1766) (internal quotation marks omitted). Under that rule, the insured "is required to disclose all circumstances known to him which materially affect the risk"; if he fails to do so, the policy is void. *Puritan Ins. Co.* v. *Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir. 1985). And "[t]he policy would equally be void, against the under-writer, if he concealed" material facts. *Carter*, 97 Eng. Rep. at 1165.

New York Insurance Law § 4226 allows an insured party to obtain a refund of the premium it has paid if the insurer has failed to disclose material facts about its financial condition. It thus derives from the common-law rule requiring full disclosure in the insurance context. Because Section 4226 provides a remedy for a harm with a "close relationship" to harms traditionally recognized as the basis for a lawsuit at common law, a party asserting a claim under that statute has suffered a cognizable injury under Article III. *Spokeo*, 136 S. Ct. at 1549.

2. In *Spokeo*, the Supreme Court noted that "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."

136 S. Ct. at 1549. And the Court has long recognized that legislation may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan*, 504 U.S. at 578; *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 617 n.3 (1973) ("Congress may enact statutes creating legal rights, the invasion of which creates standing."); *see also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 885 (1983) ("Standing requires . . . the allegation of some particularized injury to the individual plaintiff. But legal injury is by definition no more than the violation of a legal right; and legal rights can be created by the legislature."). As the Court has explained, "Congress has the power to define injuries . . . that will give rise to a case or controversy where none existed before." *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring in part and concurring in the judgment)); *accord Massachusetts* v. *EPA*, 549 U.S. 497, 516 (2007).

The Supreme Court has applied this reasoning to statutes creating an enforceable right to truthful information, holding that the deprivation of that right confers Article III standing. In *Havens Realty*

*Corp.* v. *Coleman*, for example, the Court held that African-American housing "testers" who had been falsely told by an apartment manager that no units were available to rent had standing to bring suit under the Fair Housing Act, even though they had no intention of renting a unit in the building. 455 U.S. 363, 373 (1982). The Court determined that "Congress has thus conferred on 'all persons' a legal right to truthful information about available housing" and explained that this "congressional intention cannot be overlooked in determining whether testers have standing to sue." *Id.* The injury to the statutorily-conferred right to truthful information was sufficient to satisfy Article III's standing requirements. *Id.*

Similarly, in *Spokeo*, the Court cited with approval *FEC* v. *Akins*, 524 U.S. 11 (1998), and *Public Citizen* v. *Dep't of Justice*, 491 U.S. 440 (1989), which held that the denial of information required to be disclosed by statutes—the Federal Election Campaign Act and the Federal Advisory Committee Act, respectively—could constitute a sufficient injury in fact to satisfy Article III. 136 S. Ct. at 1549-50. In such cases, the court explained, "a plaintiff . . . need not allege any *additional*

harm" beyond "the violation of a procedural right granted by statute." *Id.*

The rule established in those cases applies here because Section 4226 creates a right to accurate information about the financial condition of life insurers, as well as a private right of action for policyholders to enforce that right. The district court acknowledged that precedent but believed it to be inapplicable "where, as here, a cause of action arises under *state* rather than *federal* law," and it concluded that "whether a state law authorizes standing . . . is irrelevant to the Article III analysis." SA14-15 (emphasis in original). That reasoning is flawed.

No principle of Article III standing suggests that the existence of an injury should turn on whether the legal right invoked by a plaintiff was created by Congress or by a state legislature. To the contrary, the Rules of Decision Act, 28 U.S.C. § 1652, provides that state statutes have the same force in diversity cases as federal statutes have in federal question cases. Construing that statute in *Erie Railroad Co.* v. *Tompkins*, the Supreme Court emphasized that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to

be applied in any case is the law of the state," whether that law is "declared by its Legislature in a statute or by its highest court in a decision." 304 U.S. 64, 78 (1938). Respect for the authority of state law in federal courts is a fundamental principle of our federal system, and it would be wholly inconsistent with that principle to preclude a state legislature from creating a statutory cause of action enforceable in federal court.

Of course, Congress has the power to define the jurisdiction of the lower federal courts, and a state legislature does not. *See* U.S. Const. Art. I, § 8, Cl. 9; *id.* Art. III, § 1. But "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 136 S. Ct. at 1547-48 (quoting *Raines* v. *Byrd*, 521 U.S. 811, 820 n.3 (1997)). Federal statutes are relevant to standing analysis not because they somehow alter the requirements of Article III or expand federal jurisdiction beyond what the Constitution would otherwise allow. Rather, they are relevant because Congress may "creat[e] legal rights, the invasion of which creates standing." *Linda R.S.*, 410 U.S. at 617

n.3. And under the Rules of Decision Act, a state legislature is equally empowered to create legal rights enforceable in federal court.

The district court's contrary position is inconsistent with substantial case law from courts of appeals that have recognized that Article III standing can be based on a violation of state law. In *FMC Corp.* v. *Boesky*, for example, the Seventh Circuit observed that Article III injury may exist as a result of the invasion of statutory rights, including "legal rights growing out of state law." 852 F.2d 981, 993 (7th Cir. 1988). Similarly, addressing claims under the District of Columbia's Consumer Protection Procedures Act, the D.C. Circuit held that the "deprivation of such a statutory right may constitute an injury-in-fact sufficient to establish standing." *Shaw* v. *Marriott Int'l, Inc.*, 605 F.3d 1039, 1042 (D.C. Cir. 2010); *see also Katz* v. *Pershing, LLC*, 672 F.3d 64, 75-76 (1st Cir. 2012) (discussing Massachusetts consumer protection laws and observing that legislatures "can raise to the status of legally cognizable injuries certain harms that might otherwise have been insufficient at common law, and they may confer the authority to sue for those harms on private persons or public entities"); *Cantrell* v. *City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001) (noting that

"state law can create interests that support standing in federal courts"); *Bevill Co.* v. *Sprint/United Mgmt. Co.*, 77 F. App'x 461, 462 (10th Cir. 2003) ("While Article III standing is by definition a question of federal law, state law may create the asserted legal interest upon which the federal analysis turns."); *cf. Wendt* v. *24 Hour Fitness USA, Inc.*, No. 15-10309, 2016 WL 1458989, at *3 n.17 (5th Cir. Apr. 13, 2016) (assuming, without deciding, that "the Texas legislature, like Congress, also has the power to elevate otherwise trivial inconveniences to legally cognizable injuries-in-fact"). Section 4226 is no exception.

## III. The complaints allege that the injuries are traceable to the defendants' conduct and would be redressed by a favorable decision

The financial harms suffered by the policyholders are fairly traceable to the insurance companies' misleading disclosures because there is "a causal nexus between the defendant's conduct and the injury"—namely, that the misleading disclosures meant that the policyholders purchased policies that are riskier and worth less than they were represented to be. *Heldman* v. *Sobol*, 962 F.2d 148, 156 (2d Cir. 1992). Those financial harms will be redressed by a favorable decision awarding the recovery that Section 4226 provides.

The district court concluded, however, that the policyholders lack standing because they did not allege "that any financial harm they have individually suffered from [the companies'] pricing was fairly traceable to . . . omissions or misrepresentations in [the] financial statements." SA18 n.2. Emphasizing that the policyholders did not claim to have relied upon or consulted the statutory annual statements, the court reasoned that they had "fail[ed] to establish a causal connection between [the companies'] challenged conduct and any economic harm suffered by virtue of their purchasing decisions." *Id.* That analysis rests on a misunderstanding of the traceability requirement.

The Supreme Court has repeatedly held that "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014); *accord Bennett* v. *Spear*, 520 U.S. 154, 168 (1997). As this Court has observed, proximate-cause analysis requires that an action be a "substantial factor in the sequence of responsible causation" of a "reasonably foreseeable" injury. *Rothstein* v. *UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013). The traceability test for standing pur-

poses, by contrast, imposes "a lesser burden," and under that test, "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Id.* at 92 (quoting *Barbour* v. *Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006)). At the pleading stage, "the plaintiffs' burden . . . of alleging that their injury is fairly traceable to the challenged act is relatively modest." *Id.* (internal quotation marks omitted).

Here, the policyholders have alleged that the companies' failure to properly disclose their shadow insurance transactions meant that they offered, and the policyholders purchased, insurance with less sound financial backing than policies sold by other insurers at a comparable price. JA60 ¶ 132. The companies inflated their key financial indicators, which they then used to compete for policyholder business. JA58-59 ¶¶ 123-25. Their actions increased the risks faced by policyholders and caused the policyholders to pay premiums for life insurance policies and annuities that were less financially secure than they were represented to be. JA49 ¶ 78; JA63 ¶ 145; JA416 ¶ 66; JA433 ¶ 135. Any harm to the policyholders from the increased risk of nonpayment and the diminished value of the products they purchased was the

direct result of those actions. Those allegations are sufficient to carry the "modest" burden of showing that the injury is fairly traceable to the alleged wrongdoing.

In reaching a contrary conclusion, the district court suggested that the policyholders were required to allege that the companies' wrongful conduct somehow affected their purchasing decisions. SA18 n.2. In so holding, the court appears to have been influenced by cases involving tort claims based on intentional misrepresentations. *See* SA17 (citing *Hughes* v. *Ester C Co.*, 930 F. Supp. 2d 439, 453-54 (E.D.N.Y. 2013), and *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377-78 (E.D.N.Y. 2010)). In *Hughes*, for example, the plaintiffs did plead that their economic injuries were "fairly traceable" to the alleged misrepresentations on the packaging of defendant's products because they would not have purchased those products or paid a premium price had they known that the statements were misleading. 930 F. Supp. 2d at 453-54. But those allegations, although perhaps relevant to the standing inquiry, were necessary only because the *Hughes* plaintiffs were pursuing an intentional-misrepresentation claim—a claim that (unlike Section

4226) requires proof of reliance. *Id.* at 472-73. Had they not been pursuing that particular claim, those allegations would not have been necessary for purposes of Article III standing, which "is not equivalent to a requirement of tort causation." *Rothstein*, 708 F.3d at 92 (quoting *Pub. Interest Research Grp. of N.J., Inc.* v. *Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)). Article III does not provide a basis for imposing a reliance element that the New York Legislature did not enact. *See*, *e.g.*, *In re Empire Blue Cross & Blue Shield Customer Litig.*, 622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994) (rejecting the proposition that Section 4226 applies only to misrepresentations "that fraudulently induce[] policyholders to change policies and insurers"), *aff'd*, 640 N.Y.S.2d 102 (N.Y. App. Div. 1996).

## CONCLUSION

The judgments of the district court should be reversed, and the cases should be remanded for further proceedings.

Respectfully submitted.

*s/ Timothy W. Burns*

June 15, 2016

- 55 -

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10,782 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook font.

*s/Timothy W. Burns*

Dated:     June 15, 2016

**CERTIFICATE OF SERVICE**

I certify that on June 15, 2016, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Timothy W. Burns*